# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MARK EDWARDS,                          )
                                       )
              Plaintiff,         )
                                       )
              v.                 )      No. 4:12 CV 1977 AGF/DDN
                                       )
CAROLYN W. COLVIN,[1]                  )
Acting Commissioner of Social Security, )
                                       )
              Defendant.         )


## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Mark Edwards for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge denying plaintiff's applications be affirmed.


## I. BACKGROUND

Plaintiff Mark Edwards, born on May 9, 1966, filed applications for benefits under Title II and Title XVI of the Social Security Act on October 23, 2009. (Tr. 95, 97.) He alleged an onset date of disability of January 31, 2008, due to severe asthma. (Tr. 132.)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The Court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

Plaintiff's applications were initially denied on January 14, 2010, and he requested a hearing before an ALJ. (Tr. 57-64.)

On July 12, 2011, the ALJ found plaintiff not disabled. (Tr. 7-17.) On August 27, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On January 31, 2008, plaintiff visited the emergency department at Barnes-Jewish Hospital, complaining of cough, wheezing, shortness of breath, and chest pains. He also reported bloody stools, sharp rectal pain, and burning related to hemorrhoids. Medical staff applied Lidocaine to the hemorrhoids.[2] Hospital reports indicated history of asthma and recent incarceration of plaintiff, who denied any alcohol, drug, or tobacco use. Chest X-rays showed small lung volumes, atelectasis, and opaque spaces in the bases of each lung.[3] Plaintiff's principal diagnosis was pneumonia and asthma exacerbation. He was discharged on February 1, 2008, and prescribed Moxifloxacin, Prednisone, Ibuprofen, Advair, and Guaifenensin-dextromethorphan.[4] (Tr. 171-97.)

On February 19, 2008, plaintiff visited Grace Hill Health Center, complaining of asthma, chest pain, cough, rectal bleeding, diarrhea, and constipation. He reported tobacco use 15 years prior and occasional consumption of alcohol. Rohan Gunasingham, M.D., assessed hemorrhoids and asthma. (Tr. 198-211.)

---

[2] Lidocaine treats irritation, soreness, and itchiness from certain skin conditions such as hemorrhoids. WebMD, http://www.webmd.com/drugs (last visited on July 11, 2013).

[3] Atelectasis is a decrease or loss of air in the lungs, lowering lung volume. Stedman's Medical Dictionary 173 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

[4] Moxifloxacin is an antibiotic used to treat bacterial infections by stopping its growth. WebMD, http://www.webmd.com/drugs (last visited on July 12, 2013). Prednisone decreases immune system response to reduce symptoms of swelling and allergic reactions associated with many conditions, including breathing problems. Id. Advair is used to control or prevent symptoms of asthma or lung disease by reducing irritation and swelling of the airways while opening them to make breathing easier. Id. Guaifenensin-dextromethorphan is used to relieve cough. Id.

On November 12, 2008, plaintiff visited the emergency department at Barnes-Jewish Hospital, complaining of an asthma attack. He reported increased instances of shortness of breath, wheezing, and burning in his chest during the previous two days. Sanford S. Sineff, M.D., noted that plaintiff did not know how to medicate properly. Staff observed his diminished breath sounds and speaking in short sentences. Blood and urine samples were collected. Test results showed the presence of cocaine. Chest X-rays showed no significant changes since the last examination. Dr. Sineff diagnosed asthma and cocaine abuse and prescribed Prednisone. (Tr. 236-55.)

On July 29, 2009, plaintiff arrived at Barnes-Jewish emergency department by ambulance, complaining of an asthma attack and wheezing. He reported tobacco use within the previous 12 months. He described recent persistence of unproductive cough; inhalers provided little relief for shortness of breath that increased while he used cleaning products. Chest X-rays showed no significant changes from previous scans in that opaque spaces in the lungs persisted and may have indicated interstitial fibrosis.[5] Chandra D. Aubin, M.D., diagnosed asthma. (Tr. 216-35.)

On October 9, 2009, plaintiff visited the emergency department at Barnes-Jewish Hospital, complaining of asthma exacerbation, chest pain, cough, and shortness of breath that had persisted for months. Plaintiff indicated that chest pain was constant with a severity rating at 8 of 10; pain worsened with cough or deep breathing but could be improved by massage, and there was no relation of chest pain to exertion. Shortness of breath worsened when lying flat or with exertion. He further indicated that he could take only a few steps and could not run with his children. Plaintiff reported using an Albuterol inhaler six times per day to treat asthma and that he awakens every night with shortness of breath. Plaintiff also reported prolonged coughing associated with headache, sore throat, and occasional vomiting. He works in a tire shop and changes tires, and

---

[5] Fibrosis is the formation of fibrous tissue in reparative or reactive capacities. Stedman at 726, 991. This is a form of interstitial lung disease affecting the interstitium, which is a lace-like network of tissue throughout both lungs. WebMD, http://www.webmd.com (last visited on July 15, 2013).

exposure to household cleaners, tires, and changes in the weather exacerbate his asthma symptoms.  According to plaintiff, he quit smoking two months prior to the visit; he had smoked a pack every three days for seven years before quitting.  Jinny E. Change, M.D., prescribed Benzonatate.[6]  Physical examination revealed that plaintiff could speak in full sentences without shortness of breath.  Chest X-rays again showed opacities that suggested mild interstitial fibroses in the lungs.  CT scans showed opacities and enlarged lymph nodes, which were inconsistent with nonspecific pneumonitis or desquamative interstitial pneumonitis.[7]  Plaintiff's lungs were monitored throughout his hospital stay, and his physical condition improved with treatment such that he was without wheezing or rhonchi at the time of discharge on October 12, 2009.[8]  (Tr. 261-79.)

On January 13, 2010, Despine Coulis, M.D., completed a Physical Residual Functional Capacity Assessment.  He indicated plaintiff could lift or carry ten pounds occasionally and less than ten pounds frequently, stand or walk for two hours out of eight in a workday, and sit for about six hours out of eight.  According to Dr. Coulis, plaintiff should avoid concentrated exposure to extreme cold or heat and avoid all exposure to fumes, odors, dusts, gases, and poor ventilation.  (Tr. 280-85.)

On February 16, 2010, plaintiff visited Barnes-Jewish Hospital.  His principal diagnosis was interstitial pneumonitis.  His medication profile and prescriptions included

---

[6] Benzonatate is used to treat cough; it works by reducing reflex in the lungs that causes urge to cough.  WebMD, http://www.webmd.com/drugs (last visited on July 12, 2013).

[7] Pneumonitis is inflammation of the lung tissue.  WebMD, http://www.webmd.com (last visited on July 15, 2013).  Desquamative interstitial pneumonitis is an interstitial lung disease that is partially caused by smoking.  Id.

[8] Rhonchi are added sounds with musical pitch during inspiration or expiration, caused by air passing through bronchi (area in trachea conveying air to and from lungs) that have been narrowed by inflammation, spasm, or presence of mucus.  Stedman at 271, 1693.

Tessalon Perles, Prednisone, Bactrim, Tramadol, Pro Air inhaler, Robitussin, and Tylenol.[9] (Tr. 289-297).

On April 26, 2010, chest X-rays were conducted at Barnes-Jewish Hospital, which showed less airspace opacification in the lungs since prior tests and a decrease in the size of previously seen pleural effusion on the right side.[10] Interstitial thickening remained, likely due to plaintiff's known pathology of interstitial pneumonia. Gas detected in previous scans in the right inferior lateral chest wall had resolved. (Tr. 399.)

On May 5, 2010, plaintiff arrived at Barnes-Jewish emergency department by ambulance, complaining of shortness of breath and chest pain. He reported increased pain around an incision site from a lung biopsy a few weeks prior and cough that had persisted for two years but had been worsening recently. Medication included Guaifenesin. Lab tests were completed, indicating no changes from previous reports; interstitial thickening and opacification in both lungs were still present. (Tr. 375-98.)

On May 19, 2010, chest X-rays were taken at Barnes-Jewish Hospital and compared to images from May 5, 2010. Opacities at the bases of both lungs and interstitial thickening were still present. A suture line was also visible in the right lung. Mild right pleural thickening was unchanged since previous reports. (Tr. 373.)

On June 9, 2010, chest X-rays were conducted at Barnes-Jewish Hospital and compared to images from May 19, 2010. There had been no change in interstitial opacities in each lung or bilateral pleural thickening. The report confirmed there had been no changes to suggest pneumonia or pulmonary edema. An electrocardiograph (ECG) revealed normal sinus rhythm but possible left atrial enlargement.[11] (Tr. 371.)

---

[9] Tessalon Perles is used to treat cough by reducing reflex in the lungs that causes the urge to cough. WebMD, http://www.webmd.com/drugs (last visited on July 15, 2013). Bactrim is an antibiotic used to treat infections and prevent types of pneumonia. Id.

[10] A pleural effusion is an abnormal amount of fluid around the lungs. WebMD, http://www.webmd.com (last visited on July 17, 2013).

[11] Electrocardiographs record potential of electrical currents in the heart. Stedman at 619.

On July 21, 2010, plaintiff arrived at Barnes-Jewish emergency department by ambulance, complaining of an asthma attack, chest pains, and wheezing. Plaintiff reported that he suffered an asthma attack outside earlier that morning and that he had no primary medical doctor and obtained inhalers through his relative. He denied use of tobacco or consumption of more than five alcoholic drinks per day. Lab tests and X-rays revealed no significant changes from previous reports. Brenda M. Theilen, N.P., diagnosed asthma with acute exacerbation. Ms. Theilen's report also described a previous visit to Barnes-Jewish Hospital on April 10, 2010, wherein plaintiff complained of asthma exacerbation. At that time, he had a right lung wedge biopsy for interstitial lung disease and a chest X-ray for definitive diagnosis. (Tr. 348-70.)

On December 2, 2010, plaintiff visited the emergency department at Barnes-Jewish Hospital, complaining of asthma and chest pains. He reported having a cough for the previous one and a half years that had worsened in the two days prior to the visit; he had also been experiencing occasional cold sweats and increased shortness of breath during the same timeframe, which he claimed limited him to taking only four to five consecutive steps. He reported previous alcohol use and that he quit smoking ten to fifteen years ago. Natalie C. Battle, M.D., assessed shortness of breath, cough, asthma, nonspecific interstitial pneumonitis, hypertension, leukocytosis, and chest pain. The hospital report referred to the transbronchial biopsy completed in February 2010, which showed mild chronic inflammation but no malignancy. Dr. Battle prescribed Prednisone, Albuterol, Atrovent, Bezonatate, Guaifenesin, Symbicort, Percocet, Ibuprofen, Bactrim, and Cepacol lozenges.[12] He also received INH and vitamin B6 to treat a latent tuberculosis infection and Lisinopril to treat hypertension and hypertrophy.[13] Pulmonary

---

[12] Percocet is used to relieve moderate to severe pain by altering how the body feels and responds to pain. WebMD, http://www.webmd.com/drugs (last visited on July 12, 2013). Symbicort controls and prevents symptoms of asthma or lung disease like wheezing or shortness of breath. Id. Cepacol is used to temporarily treat symptoms caused by the common cold, flu, allergies, or other breathing illnesses. Id.

[13] Hypertrophy is the increase in bulk of a part or organ, not by tumors. Stedman at 929.

function tests showed adequate oxygen saturations at rest and while walking while breathing room air.  A transthoracic echocardiogram showed normal left ventricular and right ventricular size and systolic (heart) function, 70 percent ejection fraction, mild tricuspid (heart valve) regurgitation, and mild left ventricular hypertrophy.[14]  Plaintiff was found to be ANA positive regarding his interstitial lung disease.[15]  Chest X-rays remained unchanged since previous reports, still consistent with interstitial lung disease. Dr. Battle reported principal and secondary diagnosis as (1) nonspecific interstitial pneumonitis, (2) asthma, and (3) positive PPD.  Dr. Battle also noted plaintiff's lack of medical insurance and provided him with Medicaid application forms.  Plaintiff was discharged on December 8, 2010.  (Tr. 317-27.)

On January 21, 2011, plaintiff visited the emergency department at Barnes-Jewish Hospital, complaining of shortness of breath, chest pains, and cough which had worsened over the previous four days.  During that time, he reported feeling less relief from use of an inhaler.  Plaintiff also reported that he continued to work at a tire shop and that Percocet failed to relieve his chest pain.  In addition to others discussed during previous visits, medications included Robitussin to relieve the urge to cough, Azathioprine for immunosuppression, Lisinopril to regulate his blood pressure, Colace for constipation, calcium carbonate for hyperphosphatemia, Bisacodyl for constipation, Sulfamethoxazole to treat bacterial infection and prevent pneumonia, and Isoniazide for a latent tuberculosis infection diagnosed in late 2010.[16]  Plaintiff also reported frequent night sweats, coughing fits, and chronic rhinorrhea.[17]  He claimed to have smoked ten years prior for approximately two years.  Pulmonary function testing showed an FVC (forced vital

---

[14] The "echo" test uses high-pitched sound waves that bounce off parts of the heart to produce images of it.  WebMD, http://www.webmd.com (last visited on July 15, 2013).

[15] ANA, antinuclear antibodies, are produced by the immune system to attack one's own body tissues.  Medline Plus, http://www.medlineplus.gov (last visited on July 15, 2013).

[16] Hyperphosphatemia is a condition characterized by an abnormally high concentration of alkaline phosphatase (enzymes with pH 7+) in the circulating blood.  Stedman at 924.

[17] Rhinorrhea is discharge from the nose.  Stedman at 1690.

capacity) ratio of 81 percent, reduced lung capacity at 76 percent, and decreased DLCO (diffusing capacity for carbon monoxide) at 41 percent. Pulmonary rehab home oxygen assessment showed results at 93 percent at rest and 88 percent after a six-minute walk. Chest CT results showed unchanged thickening and traction bronchiectasis throughout the lungs and unchanged bronchial wall thickening compared to December 2010 scans.[18] Plaintiff reported bilateral hand numbness and tingling and weakness in his right hand. Although he attributed these symptoms to carpal tunnel syndrome, Dr. Kasper found his theory inconsistent with the distribution of the hand weakness. Final diagnosis from Amelia M. Kasper, M.D., was asthma exacerbation and nonspecific interstitial pneumonitis, which is inflammation of lung tissue. Exacerbation may have indicated worsening of plaintiff's diagnosed lung disease. He was discharged on January 25, 2011. (Tr. 298-316.)

On January 25, 2011, plaintiff received an oxygen concentrator with tubing and tank through BJC Home Medical Equipment of St. Louis as a new patient, as well as oxygen refills, nebulizer kit, and small volume nebulizer compressor. Specifically, records indicate that he received these items from Dr. Kasper's prescriptions. (Tr. 423, 425.)

On February 14, 2011, plaintiff underwent a urine/gastric drug screen. Test results were negative for amphetamines, barbiturates, benzodiazepines, and cocaine. Results were positive for opiates, including codeine and norcodeine. (Tr. 328-30.)

On February 22, 2011, plaintiff received oxygen refills from BJC Home Medical Equipment of St. Louis. (Tr. 422.)

In the morning of March 2, 2011, Dr. Battle returned plaintiff's phone call concerning an "important matter." During their conversation, plaintiff complained of coughing that prevented him from sleeping. He reported having trouble lying flat and sleeping only two hours per night the past several nights. Plaintiff had no fever but

---

[18] Bronchiectasis is chronic dilation of bronchi (area of the trachea conveying air to and from the lungs) or bronchioles (subdivisions of bronchi). Stedman at 269, 271.

reported subjective chills.  Plaintiff described burning chest discomfort which was exacerbated by cough and uncontrolled by Tylenol; he requested Oxycodone to relieve the pain but Dr. Battle explained that pain was likely musculoskeletal and therefore inappropriate for treatment with Oxycodone; she wanted to control his cough rather than start narcotic medications.  Dr. Battle reminded plaintiff of his upcoming pulmonary follow-up appointment on May 31, 2011, and instructed him to report to the emergency room if his symptoms continued to be bothersome or worsened.  (Tr. 404.)

In the afternoon of March 2, 2011, plaintiff arrived at Barnes-Jewish emergency department by ambulance, complaining of difficulty breathing, throbbing chest, and cough.  He also complained that use of his nebulizer afforded him no relief.  Plaintiff also suffered from tonsil swelling and pharyngitis upon arrival.[19]  Carla S. Robinson-Rainey, N.P., diagnosed asthma exacerbation and pharyngitis.  (Tr. 331-47.)

On March 31, 2011, plaintiff attended a follow-up appointment at Barnes-Jewish Hospital.  Aside from medication previously mentioned, documentation lists plaintiff's current medication: Ranitidine to treat and prevent heartburn or other symptoms of acid indigestion, Ipratropium Bromide to treat wheezing and shortness of breath, and ProAir HFA to treat asthma symptoms.  Plaintiff reported quitting smoking as recently as 2009. He reported that he exhausted his supplies for his nebulizer several weeks prior to the follow-up appointment.  Plaintiff also asked several questions regarding Medicaid coverage.  (Tr. 400-03.)

On April 5, 2011, plaintiff received oxygen refills from BJC Home Medical Equipment of St. Louis.  (Tr. 424.)

On April 22, 2011, plaintiff visited Barnes-Jewish Hospital.  His principal diagnosis was interstitial lung disease with cough.  (Tr. 416.)

On May 20, 2011, plaintiff visited and was discharged from Barnes-Jewish Hospital.  His principal diagnosis, again, was asthma.  (Tr. 416-19.)

---

[19] Pharyngitis is the inflammation of the mucous membrane and underlying parts of the pharynx, located between the mouth and nasal cavity (the throat).  Stedman at 1473-74.

On May 24, 2011, plaintiff received oxygen refills from BJC Home Medical Equipment of St. Louis. (Tr. 421.)

**Testimony at the Hearing**

The ALJ conducted a hearing on April 12, 2011. (Tr. 33-45.) Plaintiff testified to the following. He is forty-four years old, measures five feet and six inches tall, and weighs 250 pounds. He completed the twelfth grade and has previously worked as a prep cook for TGI Fridays. His longest term of employment was at Bogey's during the 1980s for about eight years. Since 1995, he has not worked at any place longer than TGI Fridays. He worked as a prep cook at Clark Resources, a bar and restaurant in Queen's Landing, in 1998. (Tr. 35-37, 39.)

He was imprisoned for seven and a half months for drug possession about three to four years prior to the hearing; this was his only felony conviction. He reports current use of an oxygen tank—visible during the hearing—because breathing is often difficult for him. Dr. Natalie Battle from Barnes-Jewish Hospital prescribed the oxygen about six to seven months ago. Each tank of oxygen lasts two to three hours and he consumes four tanks per week. He stopped smoking a couple years earlier and does not currently smoke cigarettes. (Tr. 37-38.)

Last month, he completed a pulmonary function study at Barnes-Jewish Hospital; he also has plans for another one on May 19th from his pulmonary doctor. He reports recently gaining weight. Most of his daily activities cause him breathing difficulties, or, alternatively, are inhibited by his oxygen tank. He attempts to stay active around his house but feels that he could not work due to his limited pace. (Tr. 38-39.)

Vocational Expert (VE) Ms. Gonzales also testified to the following at the hearing. The ALJ presented a hypothetical individual with plaintiff's age at onset, education, and past work experience. The ALJ limited the hypothetical individual to the following abilities: the individual can lift and carry ten pounds occasionally and less than ten pounds frequently, can stand or walk for two hours out of eight, sit for six hours, and

should avoid concentrated exposure to extreme cold or heat, and all exposure to fumes, odors, dust, and gases. (Tr. 40-41.)

The VE responded that such an individual could not perform plaintiff's past relevant work. However, such an individual could perform as an information clerk, which is sedentary, unskilled work with about 16,810 positions in Missouri and 1,052,120 positions nationally; he could also perform as a call-out operator, which is sedentary, unskilled work with about 610 positions in Missouri and 57,220 positions nationally. These jobs would permit periodic use of oxygen as needed by the hypothetical individual. The VE confirmed that her testimony is consistent with the DOT and Selected Characteristics of Occupations. She also confirmed that these jobs are all entry level and unskilled, meaning there would be no transferrable skills necessary to apply. Work associated with these jobs can usually be learned in 30 days or less, and a high school education of twelve years is sufficient qualification. (Tr. 41-42.)

### III. DECISION OF THE ALJ

On July 12, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 10-17.) At Step One of the prescribed regulatory decision-making scheme,[20] the ALJ found that plaintiff had not engaged in substantial gainful activity since October 13, 2009, which was the date of application. At Step Two, the ALJ found that plaintiff's severe impairments were asthma/chronic obstructive pulmonary disease (COPD) and obesity. (Tr. 12.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that meets or medically equals one from the Commissioner's list of presumptively disabling impairments. (Tr. 13.)

At Step Four, the ALJ considered the record and found that plaintiff had the residual functioning capacity (RFC) to perform sedentary work, except for the need to avoid all exposure to fumes, odors, dust, and gases, or concentrated exposure to extreme

---

[20] See below for explanation of the steps of the decision-making scheme.

cold and heat.  The ALJ also determined that plaintiff was unable to perform any past relevant work.  (Tr. 13-16.)

At Step Five, the ALJ considered plaintiff's age, education, work experience, and residual functional capacity to determine that plaintiff is capable of performing jobs that exist in significant numbers in the national economy.  (Tr. 16.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir.  2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009).  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. §§ 404.1520(a)(4)(i)-(iii).

-12-

If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). 20 C.F.R. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520 (a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred (1) by failing to articulate a legally sufficient rationale for concluding plaintiff did not meet and or equal Listing 3.03B; (2) in determining plaintiff's RFC by relying on Dr. Coulis' opinion without adequate support from medical evidence; and (3) in relying on the VE's testimony because its hypothetical question did not capture the concrete consequences of plaintiff's impairment.

### A. Listing of Impairments

Plaintiff argues the ALJ erred in finding that plaintiff's impairments did not meet or equal a listing. In the third step of the sequential evaluation process for determining whether an individual is disabled, the ALJ must decide whether the claimant's impairment or combination of impairments meets or is medically equivalent to the criteria of a listed impairment. See 20 C.F.R. pt. 404, subpt. P, App. 1; 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F. R. § 416.920(a)(4)(iii). If the claimant can show that his or her impairments meet or substantially equate to the criteria of a listing, the claimant will be found disabled without need for further inquiry into age, education, or work experience. Heckler v. Campbell, 461 U.S. 458, 460 (1983); Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013); 20 C.F.R. § 404.1520(d). To meet a listing, an impairment must fully satisfy all specified criteria of the listing. Sullivan v. Zebley, 493 U.S. 521,

530 (1990). That is, "[a]n impairment that manifests only some of these criteria, no matter how severely, does not qualify." Id. Similarly, to qualify for benefits by demonstrating that one's impairment or combination is equivalent to a listing, a claimant must present medical findings—such as symptoms, signs, and laboratory findings—that are at least equal to the severity of all criteria for the most similar listed impairment. Id. at 531; 20 C.F.R. § 416.926(a). Finally, the burden of proof falls upon the plaintiff to definitively show that his or her impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan, 493 U.S. at 530-31).

Plaintiff argues, specifically, that the ALJ erred by finding plaintiff's impairments did not meet or equal Listing 3.03B, which covers asthma attacks. 20 C.F.R. pt. 404, subpt. P, App. 1. First, section 3.00C covers episodic respiratory disease and provides a useful description of asthma attacks, generally:

> When a respiratory impairment is episodic in nature, as can occur with exacerbations of asthma . . . the frequency and intensity of episodes that occur despite prescribed treatment are often the major criteria for determining the level of impairment.
>
> . . . Attacks of asthma . . . are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

Id. Listing 3.03B then details, more precisely, the criteria of asthma attacks that a claimant's impairment must meet:

> B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period

-14-

of at least 12 consecutive months must be used to determine the frequency
of attacks.

Id.

Plaintiff asserts that the ALJ failed to articulate a legally sufficient rationale in making its determination that plaintiff did not meet or equal the criteria of Listing 3.03B, and that the ALJ's conclusion is not supported by substantial evidence. Plaintiff specifically points to emergency room records and inpatient hospitalizations due to his pulmonary conditions, which he alleges are sufficient to meet Listing 3.03B's requirement of at least six hospital visits in one year. Plaintiff claims he had six such visits from July 2010 to July 2011. Alternatively, plaintiff submits that his impairments are medically equivalent to a listing because he has required physician intervention for breathing problems at the given frequency when considering ongoing asthma plus pneumonia. Overall, plaintiff argues that the ALJ's analysis is "significantly lacking" and consists only of the following statement: "the Claimant's conditions do not meet or equal in severity the criteria under listings 3.00 at sequential." (Doc. 17 at 9.)

The ALJ, however, did provide some explanation throughout the text of his decision. At Step Two, for example, the ALJ emphasized that at least some of plaintiff's hospital visits during or around his proffered timeframe, July 2010 to July 2011, were unrelated or only partially related to asthma attacks, which are the specific and sole focus of Listing 3.03B that requires six attacks during twelve consecutive months. (Tr. 12-13.) Although the court prefers that an ALJ more fully explain his reasoning as to whether a claimant's impairment does or does not meet a listing, "the ALJ's conclusion may be upheld if supported by the record." Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001). Accordingly, the record contains the following hospital visits and associated diagnoses. On July 21, 2010, plaintiff went to the emergency room and was diagnosed with asthma exacerbation. (Tr. 357.) From December 2 to December 8, 2010, plaintiff was admitted to the hospital and assessed for a variety of conditions, including shortness of breath, cough, asthma, nonspecific interstitial pneumonitis, hypertension, leukocytosis, and chest pains; principal and secondary diagnoses were nonspecific interstitial

pneumonitis, asthma exacerbation, and positive PPD. (Tr. 317-18, 325.) From January 21 to January 25, 2011, plaintiff was again admitted and diagnosed with nonspecific interstitial pneumonitis and asthma exacerbation. (Tr. 314.) On March 2, 2011, plaintiff went to the emergency room and was diagnosed with asthma exacerbation and pharyngitis. (Tr. 337.) Thus, at minimum, there were four diagnoses of asthma exacerbation from July 2010 to July 2011. Listing 3.03B specifies that "each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks." 20 C.F.R. pt. 404, subpt. P, App. 1. If multi-day admissions in December 2010 and January 2011 are counted as two visits each, as plaintiff requests based on this provision, then there was a maximum of six qualifying visits.

Even viewing the record in light most favorable to plaintiff, the ALJ did not err in his conclusion that plaintiff failed to meet Listing 3.03B. That is, even if the court recognized six hospital visits within twelve months relating sufficiently to asthma attacks, plaintiff had not shown adequate adherence to prescribed treatment. In addition to the required frequency of physician intervention, Listing 3.03B requires claimants to show persistence of asthma attacks "in spite of prescribed treatment." 20 C.F.R. pt. 404, subpt. P, App. 1. Furthermore, 3.00C states that "medical evidence must also include information documenting adherence to a prescribed regimen of treatment." Id. Plaintiff, however, worked at a tire store changing tires, which the ALJ emphasized was contra-indicated for asthmatic symptoms. (Tr. 15, 261, 315.) An earlier episode of asthma exacerbation in July 2009 was triggered by plaintiff's use of cleaning products and he later acknowledged in October 2009 that such exposure, as well as tire fumes, worsened his symptoms. (Tr. 12, 222, 261.) This evidence indicates that plaintiff knew—but ignored—the risks of exposure to aggravating fumes in continuing to work at the store.

The record also shows that plaintiff was not fully compliant with his medications, which further illustrates a lack of adherence in violation of Listing 3.03B. (Tr. 12, 15, 353, 402-03.) Accordingly, plaintiff did not take his medications as regularly as instructed, and he did not appear to have a solid understanding of how or when to use them despite instructions and information that hospital staff provided. (Tr. 12, 15, 171,

232, 290, 319, 338, 353, 357, 407.) The ALJ relied on emergency room records which showed plaintiff had responded well to medications when used correctly, supporting its conclusion that "better compliance would lead to fewer exacerbations." (Tr. 12, 15, 261-62.) See Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) ("Impairments that are controllable or amenable to treatment do not support a finding of total disability.").

Therefore, substantial evidence supports the ALJ's conclusion that plaintiff did not meet the requirements of Listing 3.03B, and plaintiff's argument is without merit.

**B. RFC Assessment**

Plaintiff argues that the ALJ erred in its RFC determination by relying too heavily upon the medical opinion of Dr. Coulis, a non-examining state-agency physician. RFC is defined as the most a person can do despite the mental or physical limitations that result from his or her impairments. 20 C.F. R. § 416.945(a)(1). RFC is a medical question, and the ALJ's conclusion must be supported by substantial medical evidence in the record. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). In determining a claimant's RFC, the ALJ shall consider "all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)); see 20 C.F.R. § 416.945(a)(3). Furthermore, "some medical evidence" of the claimant's ability to function at work must support the ALJ's RFC assessment. Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009); Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam).

Plaintiff argues that the ALJ, in relying on Dr. Coulis' opinion, incorrectly concluded that plaintiff retained the RFC to perform sedentary work with the limitations of avoiding all exposure to fumes, odors, dust, and gases, and concentrated exposure to extreme cold and heat. More specifically, plaintiff asserts that Dr. Coulis' opinion expressed in January 2010 did not take into account "a great deal of evidence received subsequent to that date indicating asthmatic exacerbations and interstitial pneumonitis."

(Doc. 17 at 13.) Medical documents, however, show no significant change in plaintiff's condition before and after January 2010. (Tr. 12-13, 171-97, 236-55, 261-79, 317-27, 331-47, 348-70, 373, 399, 406-09.) Rather, the record includes sporadic instances of asthma exacerbation, pneumonia, cough, chest pains, and hypertension following Dr. Coulis' report, which are consistent with earlier diagnoses that Dr. Coulis reviewed. (Id.) There is no indication that plaintiff's asthmatic episodes were more severe or otherwise substantively changed after January 2010. The ALJ emphasized the pulmonary function test results, which revealed only minor defects rather than drastically worsening symptoms. (Tr. 15, 280-85.) Similarly, plaintiff's own behavior indicates some level of stability in his condition as he continued to work at the tire store. (Tr. 15, 261, 315.) The ALJ confirmed, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." (Tr. 13.) Accordingly, continued asthma exacerbation after Dr. Coulis' review of plaintiff's file would not necessarily support a finding of disability or negate the legitimacy of the RFC assessment.

Plaintiff argues that Dr. Coulis' findings contradict other treating physicians and disregard third party observations. Plaintiff, however, fails to articulate more specific information about whose findings are at odds with Dr. Coulis or what additional limitations and impairments were not included. The ALJ did consider four third-party statements submitted by plaintiff, but simply gave less weight to these sources because objective medical evidence that was also available, such as the pulmonary function study, contradicted them. (Tr. 16.)

Moreover, even excluding Dr. Coulis' opinion, medical evidence supports the ALJ's decision. As recently as January 2011, treating physicians indicated that repeat pulmonary function testing showed improvement compared to December 2010; they also reported that plaintiff required no supplemental oxygen while at rest. (Tr. 309.) The ALJ accounted for plaintiff's intermittent asthmatic episodes but, again, pulmonary function tests showed only mild—and improving—defects. (Tr. 12-13.) Records also illustrate plaintiff's lack of adherence to treatment plans by continued exposure to irritating fumes and his failure to comply with medications which had been shown to be effective with

proper use. (Tr. 12-13, 15, 261-62, 309, 315.) RFC determination is a medical question, as plaintiff asserts, but the ALJ correctly considered these additional factors as part of "all relevant evidence" that must be included to make a fair and thorough conclusion. Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004); 20 C.F.R. § 416.945; see McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).

Dr. Coulis' analysis, drawn from and consistent with plaintiff's medical records, remains a valid reference in the absence of subsequent qualitative changes to plaintiff's condition. The ALJ's determination of plaintiff's RFC is supported by substantial evidence in the record and at least "some medical evidence" as required. Therefore, plaintiff's argument that Dr. Coulis' opinion is not substantial evidence for the ALJ to consider in its RFC assessment is without merit.

## C. Hypothetical Question

Plaintiff argues that the ALJ's hypothetical question to the VE did not capture the concrete consequences of his impairment. "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." Hillier v. Social Sec. Admin., 486 F.3d 359, 365 (8th Cir. 2007) (citing Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)). These hypothetical questions should include the claimant's impairments that are supported by substantial evidence in the record and accepted as true by the ALJ; they should "capture the 'concrete consequences' of those impairments." Lacroix, 465 F.3d at 889 (quoting Roe v. Chater, 92 F.3d 672, 676-77 (8th Cir. 1996)).

Plaintiff argues that the ALJ's RFC determination did not adequately account for the severity of his asthma and other symptoms and, thus, the response of the VE to the hypothetical question, based on that RFC, should not represent substantial evidence. The ALJ's questioning, however, adequately captured plaintiff's impairments that still allow him to perform unskilled, sedentary work. Because the ALJ properly determined plaintiff's RFC, the hypothetical question was "properly-phrased." Roe, 92 F.3d at 675. The ALJ acknowledged that plaintiff's ability to perform all or substantially all of the

requirements of the sedentary level of work had been impeded by limitations from his asthma, which is why both the RFC and the hypothetical question addressed plaintiff's need to avoid all fumes, odors, dust, gases, and extreme heat or cold.  (Tr. 16.)  Similarly, the VE and ALJ agree that plaintiff cannot perform past relevant work.  Nevertheless, with these limitations in mind, the ALJ lawfully relied on the VE's testimony, which constitutes substantial evidence.  According to the VE, plaintiff is able to work as an information clerk or call-out operator, both of which exist in significant numbers in Missouri and nationally and could accommodate plaintiff's medical needs.  (Tr. 16-17.)

Plaintiff argues that the VE's testimony conflicts with the Dictionary of Occupational Titles, which does not specifically indicate whether oxygen may be utilized at the designated job sites.  Plaintiff, thus, argues the VE's response that plaintiff would be able to use supplemental oxygen, if required, while working as an information clerk or call-out operator, does not constitute substantial evidence.  Social Security Ruling 00-4p requires the VE's testimony to be consistent with the DOT.  The DOT, however, is not the only source of valid information or the single most definitive authority covering every relevant job requirement.  Hillier v. Social Sec. Admin., 486 F.3d 359, 366-67 (8th Cir. 2007); Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997); 20 C.F.R. § 416.960(b)(2).  Rather, the VE's testimony was substantial evidence properly used to supplement expertise about whether oxygen tanks were consistent with the type of work permitted by plaintiff's RFC, as the DOT only offers generic descriptions and allows for clarification from experts when there is no direct conflict.  Jones v. Astrue, 619 F.3d 963, 978 (8th Cir. 2010) (citing Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003)); Hall, 109 F.3d at 1259.  Indeed, vocational experts, like Delores Gonzalez, are specialists in employment and related factors whose testimony often constitutes substantial evidence upon which the ALJ can rely, as occurred in this case.  See 20 C.F.R. § 416.960(b)(2); Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991).

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

_____/S/___David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 12, 2013.